STATE OF NEW YORK
STATE EDUCATION DEPARTMENT

------------------------------------------------------------

In the Matter of

WENDY HARRISON, on behalf of a minor child,
ELIZA COREY,

                                 Petitioner,

-against-

BOARD OF EDUCATION, HONEOYE FALLS-LIMA
CENTRAL SCHOOL DISTRICT

                                 Respondent,

------------------------------------------------------------

RECEIVED
MAR 04 2020
FERRARA FIORENZA PC

SED Appeal No. 21336

## MEMORANDUM OF LAW ON BEHALF OF PETITIONER, WENDY HARRISON

Law Office of James Cole, PLLC
*Attorney for Petitioner*
2509 Browncroft Blvd.
Suite 224
Rochester, NY 14625
585-545-0142

## PRELIMINARY STATEMENT

On January 17th, 2020 and January 21, 2020, Petitioner, Wendy Harrison, served a Verified Petition on the Honeoye Falls-Lima Central School District (hereinafter the "District"), challenging a decision of the District's Board of Education (hereinafter the "Board") upholding a long-term suspension of her daughter, Eliza Corey (hereinafter "Eliza"), after a student disciplinary hearing held pursuant to Education Law §3214. Respondent served a Verified Answer and the Affidavit of David J. Roth (hereinafter "Roth") by mail on February 22, 2020. No further filings have been made by the Petitioner or Respondent.

## ARGUMENT

### I. THE DISTRICT FAILED TO PROVIDE ALTERNATIVE INSTRUCTION WITHIN A REASONABLE PERIOD OF TIME AS REQUIRED PURSUANT TO EDUCATION LAW § 3214

As admitted to in Roth's affidavit (*Exhibit A* of Respondent's Answer), Eliza served an out-of-school suspension on October 7th, 8th, 9th, 10th, and 15th. Suspension notices sent by the District to Eliza (*Exhibit A* of Petitioner's petition) are completely devoid of any mention of alternative instruction. In fact, as far as instruction is concerned, they declare that it is the responsibility of Eliza to "make up" for missed work while she is on out-of-school suspension. Roth's affidavit further concedes that the District failed to provide alternative instruction for Eliza on October 7th, 8th, and 9th. The affidavit goes on to admit that the District didn't even offer any instruction until October 10th. Recognizing the District's failure to provide instruction as required by law, Roth's affidavit admits he arranged for (8) hours of instruction to be provided on October 15, 2019 "because of the delay in being able to schedule such tutoring."

Education Law § 3214(3)(e) makes clear that whenever a student "has been suspended pursuant to this subdivision and said pupil is of compulsory attendance age, *immediate steps* shall be taken for his or her attendance upon instruction elsewhere or for supervision or detention of said pupil..." (Emphasis Added). The Commissioner of Education has repeatedly ruled that more than two days without alternative instruction is not "immediate." (See Appeal of C.B. and B.R., 50 Ed Dept Rep, Dec. No. 16,192 (2011); See Also Appeal of Bridges (34 Ed Dept Rep 232) (1994); Appeal of Sandra, Dec. No. 13,841 (1997). Moreover, the intent of the statute is not to allow school districts to "make-up" for their failure to take immediate steps by offering additional instruction at their leisure. It is the duty, legal obligation, and responsibility of the district to ensure compliance with all legal requirements before a suspension is imposed. The fact that the district may or may not have had difficulty securing a tutor is not a concern of the student. If a parent were to deprive their child of an education, they could be charged with Educational Neglect pursuant to Education Law § 3205. The fact that a school district, whose primary function is to provide an education to children, would deprive a student of their right to an education is disgraceful. The Commissioner rulings are nothing new. Appeal of Bridges was decided in 1994. The law has not changed. It is absolutely inexcusable for the District to have deprived Eliza of her right to an education during her suspension.

Unfortunately, the New York State Legislature has yet to create legislation that would sanction school districts from violating the rights of its students in this regard. Therefore, this issue admittedly has no bearing on the outcome of the Petitioner's appeal. However, the Commissioner of Education has the authority, which it has used on many occasions, to publicly censure a District for its failure to comply with the law.

## II. THE DISTRICT FAILED TO MEET ITS BURDEN AT THE SUPERINTENDENT'S HEARING

Pursuant to Education Law §3214, the decision to suspend a student from school must be based on "competent and substantial" evidence that the student participated in the objectionable conduct (Bd. of Educ. of Monticello Cent. School Dist. v. Commissioner of Educ., et al., 91 NY2d 133; Bd. of Educ. of City School Dist. of City of New York v. Mills, et al., 293 AD2d 37; Appeal of B.M., 48 Ed Dept Rep 441, Decision No. 15,909; Appeal of V.D., 48 id. 89, Decision No. 15,800). In the instant matter, the evidence was neither competent nor substantial.

It is well recognized that "with respect to findings of fact in matters involving the credibility of witnesses, [the Commissioner of Education] will not substitute [her] judgment for that of a hearing officer unless there is clear and convincing evidence that the determination of credibility is inconsistent with the facts (Appeal of M.B., Decision No. 17,406 (June 11, 2018); citing Appeal of T.S., 57 Ed Dept Rep, Decision No. 17,233; Appeal of C.S., 48 id. 497, Decision No. 15,929; Appeal of B.M., 48 id. 441, Decision No. 15,909).

In the instant matter, the hearing officer ignored substantial and material inconsistencies in the testimonies of multiple witnesses that testified on behalf of the District. The evidence presented by the District, and ultimately relied upon by the hearing officer in making his finding, is comprised of two main components. First, K.H., a student in the district, and his friend A.P., also a student in the district, testified that they entered the gender-neutral bathroom at the high school on October 1, 2019 at approximately 8:30am. This testimony is corroborated by the video surveillance footage offered and accepted into evidence at the hearing. Although both K.H. and A.P. give different accounts of why they went to the bathroom and what they did inside, they both stated that they observed a female wearing pants exit the large bathroom stall and leave the bathroom with another female. K.H. testified that once the two females had left the

bathroom, he coincidentally dropped his phone on his way out of the bathroom and when he picked it up, he noticed that the inside wall of the large stall had writing on it. K.H. then testified that he showed the writing to his friend A.P. and they viewed the bomb threat together. K.H. testified that he and A.P. then left the bathroom and together they immediately reported the bomb threat to a staff member acting as a hall monitor right outside the bathroom. K.H.'s testimony is critical because another witness for the district, counselor Ryan Teeter, testified that he viewed the video surveillance footage from before and after K.H. and A.P. enter the bathroom at approximately 8:30am, and he identified Eliza as the female wearing pants. K.H.'s testimony in conjunction with Ryan Teeter's testimony would seemingly be strong evidence against Eliza. Unfortunately, K.H.'s testimony cannot and should not have been credited by the District or the hearing officer in any fashion. The most important part of K.H.'s testimony (in conjunction with Ryan Tetter's) is that he saw the bomb threat in the large stall immediately after Eliza had exited it. Therefore, this piece of evidence should be easily corroborated by the testimony of the other witness who was also present according to K.H., that it, his friend A.P. Amazingly, A.P. testified that she first learned of the bomb threat during the school's lockdown when another student had shared with her a photo taken of the note on the wall. To make matters worse, the photo she was shown depicted a note that was partially scribbled out. A.P. also testified that K.H. never showed her any note in the bathroom stall at approximately 8:30am after Eliza had left the bathroom, nor did she go with K.H. or observe K.H. report the note to a hall monitor outside of the bathroom. In fact, the video surveillance clearly shows both K.H. and A.P. exit the bathroom at approximately 8:40am and go their separate ways. At no point on the video surveillance is K.H. depicted reporting to, talking to, discussing with, or even interacting with any staff member or hall monitor, despite what appears to be a hall monitor or staff member

depicted only 10-15 feet from the bathroom door. The video surveillance actually shows K.H. walk in the opposite direction, away from this potential hall monitor/staff member once he exits the bathroom. These deeply troubling inconsistences surround the District's most crucial piece of evidence presented at the hearing. The credibility of a witness is earned in large part by corroboration. Here, it's not that there is insufficient evidence to corroborate K.H.'s testimony about a material fact. Rather, it's that the District's own evidence *directly contradicts* it. The hearing officer's reliance on K.H.'s testimony in this regard is insulting and embarrassing.

Even more troubling is K.H.'s testimony in conjunction with that of the school's principal, David Roth. Roth testified that immediately after receiving word from his secretary about the bomb threat, the school was placed into lockdown at approximately 9:40am. Roth further testified that his secretary had informed him that she first learned of the bomb threat when a couple of students came in through the main office to report it. When cross-examined about the identities of the students that reported it to the secretary, Roth testified that the secretary didn't specify the names of the students. Knowing that it could lead to a major discrepancy in the District's evidence, Roth made sure to follow up his testimony by stating that he had since learned K.H. was one of the students who reported the bomb threat because his secretary said so. Incredibly, this testimony was provided under oath, and yet, was so obviously fabricated. While reviewing the transcript of the hearing, it is vitally important to know that Roth was present for the entire duration of each witness' testimony, including K.H. Why he was not sequestered is beyond comprehension, but the legal rule for sequestration is to avoid situations exactly like this. What is absolutely incredible though is that even with hearing K.H.'s testimony and even with viewing the video surveillance in evidence, Roth couldn't tailor his testimony to fit the District's evidence. K.H. testified that immediately after leaving the

bathroom at approximately 8:40am, as seen on the time-stamped video surveillance, he *immediately* reported the bomb threat to a hall monitor right outside of the bathroom. Amazingly, Roth is not notified about the bomb threat until approximately 9:40am, a full hour later, at which time he locks down the building and instructs a janitor to lock the bathroom. Therefore, if K.H. is testifying truthfully, the building secretary was notified of the bomb threat an hour before notifying Roth. Fortunately, based on the testimony of A.P. and the video surveillance we know K.H.'s testimony in this regard is patently false. Instead, the evidence shows that it wasn't until an hour *after* Eliza is seen exiting the bathroom that the bomb threat was reported to Roth's secretary. This fact is actually proven based on the testimony of one of the District's own witnesses. Another student with the initials E.M., testified that she had gone back to the same bathroom that same day after her initial trip at approximately 8:00am. E.M. testified that her second trip to the same bathroom was approximately an hour and a half after her first visit, and that on her second visit she observed a large crowd of students inside the bathroom, so she left. Most importantly, E.M. testified that her second trip was *before* the lockdown. Additionally, a full review of the video surveillance shows other students entering and exiting the same bathroom up until 9:35am, when the video stops. At no point on the video surveillance is a staff member or janitor shown locking the bathroom. Students are continually going in and out of the bathroom for an hour *after* Eliza is seen exiting. Moreover, evidence at the hearing was introduced through testimony and exhibits showing that at some point the bomb threat had been partially scribbled out. Photos of the original note and the note partially scribbled out were placed into evidence. A.P. testified that the only note she saw on Oct. 1, 2019 was the partially scribbled out version when it was shared to her by mobile phone. This means the bathroom was obviously accessible and open to students for a period of time long enough to

allow someone to photograph the original note, for someone to partially scribble out the original note, for someone to photograph the partially scribbled out note, and for someone to share the photo of the partially scribbled out note with at least one other person. It would be implausible to assume that all of this occurred in a matter of a few minutes. Therefore, it's clear that the bomb threat was not reported until approximately 9:40am, when Roth's secretary notified him. And as such, every student that entered and exited the bathroom between approximately 8:40am-9:40am is a potential suspect. Yet, according to Ryan Teeter's testimony, based on K.H.'s statement that he immediately reported the threat at 8:40am, the window of suspects investigated by the District was closed to any student entering and exiting after 8:40am. The timing of when the note was first reported and by who is so critically important as it must match what is seen on the video surveillance and the testimony of Roth and E.M. The timeline provided by K.H. as to when he first reported the note and to who he reported it to is so blatantly false, it should seem obvious to anyone possessing common sense that K.H.'s testimony must be completely ignored in this regard. The hearing officer's failure to discredit K.H.'s testimony, as well as Ryan Teeter's related testimony for which K.H.'s assertions served as the basis of, shows a complete lack of common sense.

### III. EVIDENCE IMPROPERLY ADMITTED AT THE HEARING SERIOUSLY PREJUDICED PETITIONER'S RIGHTS

During the District's presentation of evidence at the Superintendent's hearing held on October 16, 2019, the District offered testimony of handwriting comparisons from two different witnesses, counselor Ryan Teeter and Social Studies teacher Nicole Glavine. Both witnesses freely admitted having absolutely no experience, training, or expertise in handwriting analysis. Mr. Teeter admitted that he was in no way familiar with the techniques used

by a forensic document examiner or handwriting expert. Both Mr. Teeter and Ms. Glavine testified about having reviewed a number of known handwriting samples from Eliza, and having compared them to the bomb threat writing. Both Mr. Teeter and Ms. Glavine testified about specific similarities that they observed when reviewing the known handwriting samples of Eliza and the bomb threat note.

At no point during either Ms. Glavine's testimony or Mr. Teeter's testimony did the district ever offer into evidence any actual document of a purported known handwriting sample of Eliza Corey. Instead, both witnesses simply testified about their findings and conclusions, making it impossible for any trier to fact to judge their credibility. In Appeal of A Student With a Disability, Decision No. 17,258 (2017), the Commissioner recognized that under New York Law, "a trier of fact may compare disputed writings to determine whether they were written by the same person" (citing Matter of Thomas v. Coughlin, 145 AD2d 695; DeJesus v. Cat Auto Tech Corp., 161 Misc2d 723; People v. Hunter, 34 NY2d 432; Ibanez v. Pfeiffer, 76 Misc2d 363; see also N.Y. CPLR §4536). The Commissioner further acknowledges that "a trier of fact's handwriting comparison may constitute substantial evidence to support an administrative determination so long as the trier of fact identifies 'sufficient similarities between the two [writings]' to comprise substantial evidence that they were written by the same person" (citing Matter of Smith v. Coughlin, 198 AD2d 726; Brown v. Fischer, 91 AD3d 1336; Matter of Johnson v. Coombe, 271 AD2d 780).

In the instant matter, the District failed to offer into evidence any of the purported known handwriting samples from Eliza that were used in the comparison performed by Mr. Teeter and Ms. Glavine. Therefore, it would be wholly improper for the hearing officer to have relied in any way on the handwriting testimony provided by either witness in his determination of guilt.

Likewise, it would have been improper for the Superintendent and the Board of Education to consider such evidence.

While Eliza did offer and have received into evidence handwriting pieces which she testified were her own, it's unknown if these same documents were used by Mr. Teeter or Ms. Glavine in their analyses. Therefore, none of Mr. Teeter's or Ms. Glavine's testimony regarding any handwriting analyses should have been considered by the hearing officer, the Superintendent, or the Board of Education, in determining guilt.

Despite its failure to offer into evidence Eliza's actual known handwriting samples used by Mr. Teeter and Ms. Galvine, the hearing officer permitted the testimony into evidence, and it thereby became part of the record for consideration. In a similar instance where "testimony was totally irrelevant to the hearing, and clearly prejudicial," the Commissioner of Education sustained he appeal "because the manner in which the disciplinary hearing was conducted was seriously prejudicial to the student's rights" (Appeal of Sedita, Decision No. 14,370). For this reason alone, Petitioner's suspension must be overturned and all records relating to the matter expunged.

## IV. THE SUPERINTENDENT MISTAKENLY FAILED TO CONSIDER NEWLY DISCOVERED EXCULPATORY EVIDENCE

Pursuant to Education Law § 3214(3)(c)(1), an appeal of a Superintendent's decision to impose a long-term suspension shall be made to "the board of education who shall make its decision solely upon the record before it." The law further declares that "the board may adopt in whole or in part the decision of the superintendent of schools." Interestingly, there is no provision contained anywhere in Education Law that expressly prohibits a superintendent from acting *sua sponte* to reduce a long-term suspension or reverse a prior finding of guilt. In fact, if

such a statute did exist it would overtly contradict the basic rules of our state's due process protections. This is precisely why the New York Code of Rules and Regulations under § 8 CRR-NY 276.8NY-CRR allows for petitions to the Commissioner of Education to re-open a previously decided appeal. Such petitions must allege that the Commissioner's previous decision was either based on a misapprehension as to the facts or that there is new and material evidence which was not available at the time the original decision. Likewise, the Criminal Procedure Law pursuant to § 330 and § 440 allow individuals convicted of an offense the opportunity to move to vacate a conviction on the basis of newly discovered evidence, inter alia. Education Law § 3214(3)(e), does specifically declare that "[w]here a pupil has been suspended for cause, the suspension may be revoked by the board of education whenever it appears to be for the best interest of the school and the pupil to do so." Such power and authority is necessary when the standard of proof required to deprive an individual of a constitutional right is anything less than absolute certainty. "The law recognizes that, in dealing with human affairs, there are very few things in this world that we know with absolute certainty" (NY Crim. Jury Instr., *Burden of Proof*). Accordingly, a vehicle must always exist to allow for a correction when an error in the system of rules has occurred.

In the instant matter, immediately after the conclusion of the Superintendent's hearing, Eliza's mother set up arrangements to have a polygraph examination administered as well as a forensic document examination done. Shortly thereafter, reports containing conclusions and expert opinions dated October 28, 2019, were generated and immediately provided to School Superintendent Gene Mancuso through the District's attorney. Amazingly, as evidenced in *Exhibit H* of Petitioner's petition, the District's attorney declared that it would be "improper" for the superintendent to consider any new evidence not already contained with the record of the

superintendent's hearing. If this were true, then innocent students could be deprived of their constitutional right to an Education. For example, if student A is suspended after a superintendent's hearing for conduct actually committed by student B, and student B later admits to the conduct, and student A provides independent credible corroborating proof that student B is the responsible party, the superintendent would have no ability to consider such evidence, and student A would remain suspended until either a Board of Education or the Commissioner of Education chose to reverse said suspension. Such a scenario shocks the conscience, and lacks common sense, sound logic and rationale. Although likely not common place, situations have arose in which superintendents have considered new evidence not originally offered at the superintendent's hearing. In Appeal of B.P., Decision No. 15,807 (2008), the Commissioner's decision makes reference to such a situation:

> "Following the superintendent's decision, petitioner retained new counsel and by letter dated November 13, 2006, petitioner appealed the superintendent's determination and requested that the superintendent consider new evidence obtained subsequent to the superintendent's hearing. The superintendent advised petitioner by letter dated December 11, 2006, that the new evidence did not alter his determination."

Nowhere in the decision does the Commissioner state that the superintendent acted improperly for considering new evidence, nor does it state that such new evidence cannot be considered by the superintendent.

What has been offered to the superintendent, and subsequently ignored, is newly discovered independent evidence that relates to a material fact at issue. Such proof consists of a polygraph examination conducted on October 28, 2019, and a forensic document examiner's report dated October 28, 2019. It should be noted that a big part of the reason why the polygraph examination and forensic document examiner's report were not available at the time of the

superintendent's hearing is due to the limited time period in which Ms. Corey had to prepare for said hearing. Ms. Corey's short-term suspension began on October 8, 2019 and ended on October 15, 2019. The superintendent's hearing was subsequently held on October 16th. Additionally, as mentioned previously, the District held a second informal conference with the principal and Ms. Corey's mother on October 15th, at which time she first learned of the District's intention to use handwriting evidence against her daughter. Had the District been more forthcoming about its evidence, or provided discovery in advance of the hearing as was requested by counsel, we may have been able to secure and present this evidence at the superintendent's hearing. It is anticipated however that the Respondent might argue that Petitioner had the right to make an application to adjourn the hearing in order to gather said evidence. And since no such application was made, Petitioner's newly discovered evidence should be disregarded. Such an argument seemingly shifts the burden of proof to the student, contrary to Education Law §3214. In addition, it is well understood that when a student requests an adjournment of the hearing, he or she will remain in out-of-school suspension until the hearing has concluded. This rule places the student in a difficult position: go forward with the hearing as scheduled and possibly be terminated from any further out-of-school suspension, or request to adjourn the hearing, thereby voluntarily accepting further punishment so that you may gather exculpatory evidence to prove your innocence. And if the student is ultimately successful in proving his or her innocence, it is of no value as the student has already suffered the consequence regardless.

Whether or not the District mistakenly decided to ignore the newly discovered evidence as a result of its own belief, or whether the decision was based on advice from counsel, the mistake must be corrected. The Superintendent has the authority to review any and all evidence

he or she so chooses when deciding the outcome of a student disciplinary hearing. The fact that the District has attempted to wash its hands of responsibility in this matter is disheartening and unfortunate. A fourteen-year-old child has been accused by the District of making a terrorist threat against her classmates. It would seem that the least they could do is make sure they are accusing the right person. Part of being human is making mistakes. Part of being a professional is knowing when to correct them.

## CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that the Commissioner grant the Petitioner's Appeal in its entirety and grant such other and further relief as the Commissioner of Education deems just and proper.

Respectfully submitted,

James Cole, Esq.
Law Office of James Cole, PLLC
Attorney for Petitioner
Rochester, NY 14625
Telephone: (585) 545-0142
Facsimile: (585) 219-5634